E. H. EMERY & COMPANY, Appellant, v. WABASH RAILROAD COMPANY et al., Appellees.

**CARRIERS:** Written Claims for Damages. The requirement of an interstate B/L that claims for damages be made (a) in writing, and (b) within four months, etc., is for the purpose of enabling the carrier, *by prompt notice*, to adequately protect itself. No particular form of written notice is essential. *Held*, such requirement was sufficiently met 'by a writing, evidencing a joint inspection by shipper and carrier prior to delivery, which writing specified the shipment and the *extent of damage thereto*, was duly signed by the carrier's agent, and by him indorsed on the shipper's freight receipt. *A priori* such writing is sufficient when followed by a written notice by the shipper to the carrier, specifying the shipment and damage thereto, coupled with a written expressed *intention* of filing future claim.

**EVIDENCE:** Agent Reporting to His Principal. It will be presumed that the agent of a common carrier duly reported to his superior officers a fact which it was his duty to know, which he did know, and which it was his duty to so report.

**CARRIERS:** Bill of Lading Requiring Written Notice, Etc.—Waiver. The plea that the provisions of an interstate B/L which provides that claims for damages must be filed in writing and within a specified time *may not be waived*, because such waiver would work an unlawful discrimination between shippers, will not be heeded when it appears that the Interstate Commerce

Commission, within the range of its discretion, has formally held that, under stated conditions, the *waiver* of such provision actually worked for *equality* between shippers, while the literal enforcement of said provision actually worked a discrimination.

GARNISHMENT: Time of Perfecting Appeal. Attachment proceedings and garnishments thereunder are collateral to the main action and are carried down by a final judgment against the plaintiff in the main action, and are not preserved for review on appeal unless intention to appeal is announced at the time of such adverse judgment, and unless appeal is perfected within two days thereafter. (Sec. 3931, Code, 1897.)

APPEAL AND ERROR: Non-Ruling in Trial Court. A question not presented to, and ruled on by, the trial court may not be reviewed on appeal. So held as to a controversy concerning the scope of an appearance in the trial court.

APPEAL AND ERROR: Directing Judgment in Lower Court. When all questions of law and fact are, on plaintiff's appeal, fully settled in favor of plaintiff's recovery, a reversal will be entered with orders to the lower court to enter judgment; otherwise, an order for a new trial will be entered. So held in an action against a carrier for damages to a shipment of goods.

CARRIERS: Damages—Measure. In an action for damages to a specific part of a shipment, the carrier may not contend for a measure of damages which would apply the shipper's profits on the undamaged part to the payment of the damage caused by the carrier.

CARRIERS: Initial and Subsequent Carriers—Liability. Principle recognized that an initial interstate carrier is liable for all damages caused, either by its own negligence or by the negligence of a connecting or delivering carrier; while a delivering carrier is liable only for damages caused by its own negligence.

CARRIERS: Damages—Presumption. Principle recognized that a shipper is entitled to the benefit of the rebuttable presumption that the delivering carrier received the goods in as good condition as they were in when received by the initial carrier.

CARRIERS: Perishable Goods—Damages—Burden of Proof. Principle recognized that the shipper of perishable goods, in an action against a delivering interstate carrier, has the burden to prove that the goods were delivered to the initial carrier in such condition that damages thereto could only occur by reason of some negligence of the carriers'.

*Appeal from Wapello District Court.*—SENECA CORNELL,
Judge.

MARCH 6, 1918.

REHEARING DENIED MAY 17, 1918.

ACTION for damages for loss and injury in certain ship-
ments of berries. The petition was in four counts, and
claimed injuries, respectively, on four carload lots. The
case was tried to the court without a jury. There was a
finding and judgment dismissing the petition, and the plain-
tiff has appealed.—*Reversed.*

*Chester W. Whitmore,* for appellant.

*Helsell & Helsell, McNett & McNett, J. L. Minnis, N. S.
Brown, Blewett Lee,* and *W. S. Horton,* for appellees.

EVANS, J.—The plaintiff was engaged, at Ottumwa, in
the business of shipping and handling fruit and vegetables.
Each count of its petition declares for damages to a car-
load shipment of strawberries. The first
three shipments declared upon in the first
three counts of the petition originated at
Independence, Louisiana, and were shipped
over the line of the Illinois Central Railroad Company, as
the initial carrier, and over the line of the Wabash Rail-
road Company as the terminal carrier. The fourth car orig-
inated at Judsonia, Arkansas, and was shipped over the
line of the Iron Mountain Railway as the initial carrier,
and over the line of the Wabash as the terminal carrier.
All deliveries were made at Ottumwa by the Wabash Com-
pany. As to the fourth shipment, the initial carrier is not
before the court. As to the other three shipments, both
the initial and the terminal carriers are impleaded. Each
shipment was made in a specially equipped car. The first
car was shipped on or about April 29, 1912, and is known in

1. CARRIERS:
written claims
for damages.

Vol. 183 IA.—44

the record as No. 56536; the second car involved was shipped on or about April 27, 1913, and is known in the record as No. 12470; the third car was shipped on or about May 1, 1913, and is known in the record as No. 56610; the fourth car was shipped on or about May 22, 1913, and is known in the record as A. R. T. 9068. The foregoing initials refer to the American Refrigerator and Transportation Company. In the consideration of the case, it will be more convenient for us to refer to these cars as Nos. 1, 2, 3, and 4, in the order of their dates of shipment.

These shipments were all made under uniform bill of lading, standard form, approved by the Interstate Commerce Commission. It contained the following provision:

"Claims for loss, damage, or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made, the carrier shall not be liable."

The defendant set up the foregoing provision of the bill of lading, and alleged a breach thereof as a defense to the action. The trial court sustained such defense. The correctness of this holding is the controlling question in the case upon all counts. As to the foregoing defense, the plaintiff both denies and avoids. That is to say, it contends: (1) That it did give notice in writing, which was a sufficient compliance with the requirement of the bill of lading; and (2) that the defendants waived any further or more formal compliance with such requirement.

The facts pertaining to the attempted compliance with this requirement of the bill of lading which pertain to shipments Nos. 2, 3 and 4 are practically identical; whereas those pertaining to shipment No. 1 are somewhat different. We shall, therefore, consider together the facts pertaining

to the last three shipments, and will give these our first consideration.

I.    Shipment No. 2 was received at Ottumwa on April 27, 1913, in bad condition.   A joint inspection of the same was immediately had by Jacobs, the station agent of the railway company, and Veitch, for the plaintiff.   They joined in an inspection report upon blank forms of the railway company, as follows:

"Bracing broken, crates pushed forward, 50 crates in doorway broken, contents partly out on floor, contents shows rough handling."

The same notation above quoted was endorsed by Jacobs, the railway agent, upon the freight bill of the plaintiff, and delivered to the plaintiff.   On the following day, the plaintiff delivered to the agent of the delivering carrier the following notification:

"Agent Wabash, City.

"Dear Sir: This is to notify you that, in due time, we will file a claim against your company for damages sustained on car berries P F E 12470 from Independence, Louisiana, to Ottumwa, arriving April 27th, 1913, as per the inspection report of which you have been furnished a copy.

"Yours truly,

"E. H. Emery & Co."

The third shipment in question arrived at Ottumwa on May 1, 1913, in bad condition.   A joint inspection thereon was immediately had by one Williams for the railway company, and Veitch for the plaintiff.   They joined in a report upon the blank forms of the company, which included the following:

"Bracing broken; crates shifted and broken; crates piled up in doorway; with part contents on floor: 100 c broken.

"Who was present when you made above inspection: L. C. Williams.

"Describe its appearance and condition on such examination. Contents show very rough handling."

The foregoing report was also entered upon the back of the plaintiff's freight receipt by the local agent of the delivering carrier, as follows:

"Bracing broken, crates shifted and broken, crates piled up in doorway with part of the contents on the floor; 100 crates broken; contents show very rough handling.

"Received payment.

"Thos. H. Jacobs, Agent.

"Per E. R. H., Cashier."

On the same day, the plaintiff delivered to the agent of the delivering carrier the following notice:

"Agent Wabash, City.

"Dear Sir:

"This is to advise you that we will file claim against your company for damages on C. F. D. X 56610 strawberries from Independence, Louisiana, arriving in Ottumwa, May 1, 1913, at 1:20 P. M. We will make this claim on the basis that the bracing was broken, crates shifted and broken, crates piled up in the doorway, with part of the contents spilled on the floor. One hundred more or less broken. This was inspected by your Mr. L. C. Williams and our Mr. P. E. Veitch, a copy of the inspection report has been furnished you.

"Yours truly,

"E. H. Emery & Co."

Shipment number four arrived at Ottumwa on May 22, 1913. The damaged condition of this car was claimed to be the result of negligent refrigeration, and not of rough handling of the car. The berries were badly decayed. A joint inspection was also had of this car by representatives of both parties. They joined in a report, which contained the following: "Contents show every evidence of car being out of ice en route; contents show heavy decay." The

foregoing quotation was also entered by the local agent of the delivering carrier upon the plaintiff's freight receipt. On the following day, the plaintiff delivered to the agent of the delivering carrier the following notice:

"Agent Wabash, City.

"Dear Sir:

"This letter is to notify you that there will be a claim filed for insufficient icing and poor refrigeration on car berries A. R. T. 9068 arriving at 2:45 P. M. May 22, 1913. The berries were in fearful condition, the cases mouldy, the fruit leaking throughout, the cases showing every evidence that the car had not been properly handled en route. From the fact that the car had been iced at Moberly and St. Louis would prove the fact that the car was warm upon its arrival at St. Louis. In due time, we will file a claim against your road as the delivering line. You have been furnished with a copy of the inspection report.

> "Yours truly,
>
> "E. H. Emery & Co."

The plaintiff did not, within four months, present a claim in writing, except as shown in the foregoing. Our first question, therefore, is, Did the foregoing substantially comply with the requirement of the bill of lading that claims for damages "must be made in writing?" The question presented is controlled by the Federal law. We are not at liberty, therefore, to deem our own previous decisions as authoritative. These would, without doubt, require an affirmative holding. It will be noted that the written notices or letters delivered to the agent by the plaintiff spoke in the future tense. Two of them stated that claim would be filed "in due time." The argument for the appellee is concentrated largely upon this feature of the form of the notice, in that it indicated a purpose to file, in the future, a more formal claim; and that it thereby indicated that the plaintiff itself did not deem the writing as a sufficient compli-

ance with the requirements of the bill of lading. The plain-tiff did, later, in each case, file a somewhat more formal claim, but not within four months. This argument necessarily assumes that the claim made might have been sufficient if it had spoken in the present tense. We are impressed that such distinction is more grammatical than substantial, in a legal sense. The bill of lading specified no details as to the form in which a claim should be made. It only required that it be a claim for damages, and that it be in writing. This was in writing. In the light of the joint inspection report and the notation by the agent upon plaintiff's freight receipt, the notice could hardly be construed as other than a claim for damages. We are relieved, however, from the necessity of passing upon the question as an original one. We deem the question here presented as having been clearly determined by the United States Supreme Court in *Georgia, F. & A. R. Co. v. Blish Milling Co.*, 241 U. S. 190. In that case, a carload of flour had been damaged by water. Some telegrams passed between the consignee and the railway company officials concerning the nature of the damage; whereupon, the consignee sent to the railway company the following final telegram:

"We will make claim against railroad for entire contents of car at invoice price. Must refuse shipment, as we cannot handle it."

The bill of lading had precisely the same provision as is under consideration in the case at bar, and it was pleaded by the railroad company in defense. It was held that the telegram was a sufficient compliance with this requirement of the bill of lading. In that case, as in this, the telegram spoke in the future tense. The amount of damages was not specified. No more formal claim than the telegram was made within four months. It is urged by the appellee that the case is not controlling, because it involved the entire carload, and because it involved a question of delivery.

What other questions were involved in that case are not so material for our consideration. It was involved whether the telegram set forth was a sufficient compliance with the particular requirement of the bill of lading which is involved herein. We quote from the opinion as follows:

"In the preceding telegrams which passed between the parties, and are detailed by the state court in stating the facts, the shipment had been adequately identified; so that this final telegram, taken with the others, established beyond question the particular shipment to which the claim referred, and was, in substance, the making of a claim, within the meaning of the stipulation,—the object of which was to secure reasonable notice. We think that it sufficiently apprised the carrier of the character of the claim; for, while it stated that the claim was for the entire contents of the car 'at invoice price,' this did not constitute such a variance from the claim for the value of the flour as to be misleading; and it is plain that no prejudice resulted. Granting that the stipulation is applicable and valid, it does not require documents in a particular form. It is addressed to a practical exigency, and it is to be construed in a practical way. The stipulation required that the claim should be made in writing; but a telegram which, in itself, or taken with other telegrams, contained an adequate statement, must be deemed to satisfy this requirement."

We think the case is authority upon the question before us. It has been so treated by a number of other state courts of last resort in similar cases. *Shark v. Great Northern R. Co.*, 37 N. D. 342 (164 N. W. 39) ; *Baltimore & O. R. Co. v. Leach*, 173 Ky. 452 (191 S. W. 310) ; *New Orleans & N. E. R. Co. v. Wood*, 112 Miss. 614 (73 So. 615) ; *Illinois Cent. R. Co. v. Bauer*, 114 Miss. 516 (75 So. 376) ; *Snyder v. King*, (Mich.) 165 N. W. 840. See, also, *Southern Pac. Co. v. Stewart*, 147 C. C. A. 630 (233 Fed. 956). The inspection report and the notation upon the freight receipt made by

the railroad agent specified, in each case, the number of crates that were destroyed. The plaintiff has sued for the value of just that number of crates, so specified, respectively, in each case, at invoice prices plus freight paid and expense of sorting, and for nothing more. The plaintiff makes no new demand in its suit, but confines itself strictly to the damages as ascertained in the inspection report joined in by the railroad company's agent. We hold, therefore, that the requirement of the bill of lading relating to the method and time of making claim for damages was sufficiently complied with.

II. The evidence relating to shipment No. 1 and the damage thereto is more meager than that considered in the foregoing division. This shipment arrived at Ottumwa on May 4, 1912. The car and the berries contained therein were damaged, apparently, by rough handling. At the request of the plaintiff, the local agent of the delivering carrier immediately made an inspection of the contents of the car and reduced his report to writing, and endorsed the same upon the back of the freight receipt over his signature. Such endorsement was as follows:

"Blocking in door broken, one end of car. Contents jammed also in door. Estimated 150 crates smashed. Part of contents on car floor."

Plaintiff sues herein for the loss of 150 crates of berries, as specified in such report. The plaintiff did not, in this case, deliver to the railroad agent a written notice of a claim for the damages, as it did in relation to the other three shipments. It is contended for appellant that such a written notice was rendered entirely unnecessary by the fact that the railway agent had already made the inspection and ascertained the loss, and by the further consideration that the plaintiff is in no manner disputing the inspection report of the railroad agent. If the plaintiff had delivered to the railroad agent a writing similar to those considered

in the first division hereof, it could have served no other
purpose than to advise the agent of the same facts of which
he had already, in writing, acknowledged not only notice
but knowledge.   If the purpose of the requirement in the
bill of lading was only to give prompt notice, and thereby
to enable the railway companies to investigate the facts,
then there is great force in appellant's contention.   That
such is the purpose of such bill of lading requirement is
declared in the opinion in the *Blish* case.   When the local
agent of the delivering carrier made his inspection report
and endorsed the same upon the freight receipt, he so en-
dorsed it, not only over his own signature, but over the
stamped signature of the higher officials.   It was his duty
to have reported to the higher officials the record thus made
by him.   We see no reason why he should
2. EVIDENCE:           not be presumed, *prima facie* at least, to
   agent report-
   ing to his         have so reported.   This presumption re-
   principal.          ceives confirmation in the subsequent con-
duct of the railroad officials.   In the subsequent nego-
tiations and correspondence pertaining to this claim
covering a period of more than 18 months, the claim de-
partment raised no question as to the method or time
of presentation of the claim.   There is respectable au-
thority to the effect that, where the proper agent of
a railroad company has inspected the injury, and es-
pecially if he has reported the same in writing to the
higher officials, this is a sufficient compliance with the re-
quirement of a bill of lading that a claim shall be made in
writing.   In the recent case of *Snyder v. King*, (Mich.) 165
N. W. 840, the question of damages sustained by injury to
animals was involved.   The owner advised the railroad
agent that claim would be made.   The agent examined the
extent of the damage and reduced his finding to writing,
in the form of a letter to his superiors.   The requirement
of the bill of lading was that claim of damages should be

made by verified claim in writing within five days. The
plaintiff presented a formal claim after the expiration of the
five days. It was held by the Supreme Court of Michigan
that the action of the agent sufficiently fulfilled the requirement
ment of the bill of lading, and that it was not essential
that the owner of the horses should himself have presented
the writing. The opinion in this case purports to be guided
by the reasoning of the United States Supreme Court in
the *Blish Milling* case, supra. In *Hinkle v. Southern R.
Co.*, 126 N. C. 932 (36 S. E. 348), the owner of cattle injured
in shipment, in receipting for the delivery of his cattle,
wrote upon the receipt, over his signature, the words "under
der protest." The North Carolina court held this to be a
sufficient compliance with the requirement that claim should
be made in writing. In *St. Louis, I. M. & S. R. Co. v. Cumbie*, 101 Ark. 172 (141 S. W. 939), the consignee of a shipment
ment of peaches refused to accept the same because of their
damaged condition. The railway agent was present in an
examination thereof. The consignee sent a telegram to the
consignor, advising him of his refusal to accept the peaches
because of their damaged condition. A copy of the telegram
thus sent was delivered by the consignee to the railroad
agent. This was held by the Arkansas Court to be a sufficient
cient compliance with the requirement of the bill of lading,
which was similar to the requirement under consideration
herein. In *Kelly v. Southern R. Co.*, 84 S. C. 249 (66 S. E.
198), the Supreme Court of South Carolina held that,
where the injury to goods is examined by the carrier's agent,
for the purpose of ascertaining its extent, the requirement
limiting time for filing a claim has no application. In
*Shama v. Chicago, M. & St. P. R. Co.*, 128 Minn. 522 (151
N. W. 406), a box of merchandise was missing from a shipment,
ment, and this fact was noted in writing by the railway
agent and delivered to the consignee plaintiff therein. This
was held by the Supreme Court of Minnesota to be a suffi-

cient compliance with the bill of lading requirement under consideration here. In line with the foregoing holdings is that in the case of *Southern Pac. Co. v. Stewart,* 147 C. C. A. 630 (233 Fed. 956), where it is held, in substance, that actual knowledge of the facts by the railroad agent dispenses with the necessity of formal notice. In *Shark v. Great Northern R. Co.,* 37 N. D. 342 (164 N. W. 39), in a case where the owner of property made oral claim, which the railroad agent put in writing, and upon which the higher officials of the railway company acted, and it was held that this was sufficient compliance with the requirement. for a written claim. Several of the foregoing cases here reviewed were decided subsequently to the *Blish Milling* case, and the conclusions therein purported to be reached pursuant to the holding and reasoning in the *Blish* case. We think it must be said, therefore, that the weight of authority has set quite definitely in the direction here indicated. The validity of this requirement of the bill of lading has been sustained on the ground that its purpose is reasonable, and in harmony with the spirit of the Interstate Commerce Act. If the purpose were not such, the condition itself would be disregarded by the courts as an infringement upon the. statute. It is deemed reasonable that, in the event of a claim for damages to a shipment, it shall be brought to the attention of the carrier with reasonable promptness, in order that it may have opportunity to investigate while the facts are fresh and evidence available. Where, in a given case, therefore, it is made to appear that an immediate inspection before delivery has been had by the carrier's proper agent, and the result of the inspection has been reduced by him to a formal writing, and the same delivered to the shipper, and presumptively to the higher officials of the carrier, and where the shipper confines his claim to the exact damage found by the inspection report; why is not the reasonable purpose of the requirement thereby met, and

what is there left of such reasonable purpose for its further operation? To insist upon a further writing is to insist upon the merest technicality, and to render the condition itself unreasonable, under such circumstances. This holding doubtless carries us a little further than the actual holding of the court in the *Blish* case, but it is in harmony with the reasoning thereof. Counsel for appellees urge upon our attention at this point *St. Louis, I. M. & So. R. Co. v. Starbird,* 243 U. S. 592. We find nothing in the opinion therein running counter to the foregoing. It was simply held there that mere verbal notice to a dockmaster of the generally bad condition of a car of peaches was not a compliance with the requirement of the bill of lading, and did not meet the reasonable purpose thereof. We are constrained, therefore, to hold that the requirement of the bill of lading was sufficiently complied with as to this shipment, as well as to the others.

III. The question of waiver has been quite fully discussed in the briefs. In view of our conclusion reached in the foregoing division, it is perhaps not very necessary that we should deal with such question, and we

3. CARRIERS: bill of lading requiring written notice, etc.: waiver.

shall do so only briefly, and only as it pertains to the first shipment. Disregarding, for the moment, the question of whether it was competent for the railroad company to waive the provision, and for the plaintiff to accept a waiver, because of the provisions of the Interstate Commerce Act, we may say that waiver by the railroad company of this requirement of the bill of lading abundantly appears in the record. The plaintiff presented its formal claim December 4, 1912. It went to the claim department, and was marked "O. K." and "Voucher," and returned to the local agent, who called upon the plaintiff and required information and data as to the amount of the original invoice and the account of sales of the undamaged goods. These were furnished. More or

less correspondence ensued between the plaintiff and the claim department, wherein no question was ever raised as to a failure to comply with the requirements of the bill of lading in the presentation of the claim, until February, 1914. The fact of waiver, therefore, was proved without dispute. Whether the waiver can be recognized by the courts, and thereby given effect, is a more difficult question. If not, it is because such recognition is forbidden by public policy and the Interstate Commerce legislation. It is not because the defendant may repudiate the waiver, as a matter of right. It is the intent of the Interstate Commerce Act to abolish and prevent all preferential treatment and discrimination on the part of railroad companies toward their patrons. Privileges and generosities may not be extended to one and withheld from another. To that end, publicity of tariffs and privileges is provided, and departures therefrom are not tolerated. The form of the bill of lading in this case was duly published, and was duly approved by the Interstate Commerce Commission. *Prima facie,* therefore, public policy forbids waivers of its requirements, as tending to create the favoritism and discrimination which the Interstate Commerce Act was intended to prevent. This is the reason, and the only reason, for a refusal of the courts to give recognition to such waiver. Such was the reasoning adopted in the *Blish Milling* case, supra, and in *Missouri, K. & T. R. Co. v. Ward,* 244 U. S. 383.

A somewhat anomalous situation, however, is made to appear in this record. By virtue of certain orders of the Interstate Commerce Commission, promulgated and published in February and March, 1914, and duly pleaded and proved herein, it is made to appear that the particular requirement under consideration herein had not been universally adopted by the railroad companies, and that the same was not in force at all in certain sections of the country; and that its enforcement in other parts of the coun-

try worked the very discrimination which the Interstate Commerce Act had sought to avoid. The ruling thus promulgated was, in part, as follows:

"For the purpose of promoting uniformity as to the substance and form of bills of lading, the carriers operating generally in official and western classification territories, after numerous conferences with shippers and this Commission, covering a considerable period of time, agreed upon what was designated as the 'uniform bill of lading,' which, upon final submission to the Commission, was, in a report announced June 27, 1908, recommended by it for use among all carriers. 14 I. C. C. 346. In that report, it was indicated that the Commission would not, at that time, undertake to order the carriers to use this form of bill of lading, and it was made clear that the recommendation thereof was to be understood as subject to such modification or change as might be found necessary, either by experience or upon further investigation. The form and contents of the bill of lading thus agreed upon by shippers and carriers, and recommended by the Commission, was adopted by most of the carriers in the territories mentioned, and its provisions embodied in their freight classifications, which were published and filed with the Commission, thus becoming a part of their established tariff schedules. Among these provisions was the following (Section 3, Paragraph 3) : 'Claims for loss, damage, or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or, in case of failure to make delivery, then within four months after a reasonable time for delivery has elapsed. Unless claims are so made, the carrier shall not be liable.' It has been disclosed by investigation and otherwise that, during much of the period since these provisions became part of the tariff schedules of said carriers, the provision above quoted has, to a greater or less extent, been disregarded by

most or all of them, for various causes.   In many instances, in the establishment of commodity rates they have not made the proper reference to this provision published in their classifications so as to make it applicable to such commodity rates.   In this respect, again, there appears to have been no uniformity of practice.   The observance and enforcement of this limitation as to the time for presenting to the carriers claims for loss of or damage or delay to freight in some cases, and the waiver or disregard of it in others, result, of course, in widespread and serious discrimination in the territories mentioned.   The carriers in the south did not generally adopt the so-called 'uniform bill of lading,' but adopted instead another form, known as the 'standard bill of lading,' which contained many features, including this provision, common to both.   These carriers, however, did not make the provisions of their bill of lading a part of their classification or tariff schedules, and there does not appear to be much cause of complaint in this respect in that territory.   The representatives of carriers and shippers alike, appearing in a general proceeding of inquiry respecting the matter of bills of lading now pending before the Commission, have joined in a request for the Commission's approval of a waiver by the carriers of the above provision, limiting the time within which claims of the character referred to might be presented to the carriers, with respect to all such claims presented prior to December 1, 1913, that were not presented within the four-months period, and also all claims accruing within two years prior to the date of this report which have not been presented to the carriers, provided such claims are presented to the carriers on or before April 1, 1914.   It is urged that a waiver of this four-months limitation provision to the extent indicated is the only course that will prevent or cure the discrimination otherwise resulting.   This is evidently true." 29 I. C. Com. Rep. 417.

It also promulgated a ruling to the effect that a written notice of a claim should be the equivalent of the presentation of a claim.

If the foregoing order of the Interstate Commerce Commission can be regarded as authoritative for any purpose, it is, by its terms, applicable to each and all of the shipments involved herein. . It is naturally urged by the appellees that their rights were vested, and that no order of the Interstate Commerce Commission could relate back and affect such rights. The argument is doubtless sound, so far as any actual rights of the appellees are involved. As already indicated, however, it is not a matter of right to the appellees to repudiate their waiver, if waiver there was. They are protected at that point, if protected at all, by the operation of a rule of public policy. If the recognition of a waiver tends to discrimination, it will not be recognized by the courts. If it does not so tend, it will be recognized. The Interstate Commerce Act has conferred upon the Interstate Commerce Commissioners a certain power of discretion in details which is to be used in aid of. the practical purpose and operation of the statute itself. The approval of the form of a bill of lading is within the power thus conferred upon such board. It will be seen, from an examination of the ruling promulgated, that the enforcing of the provision here under consideration had itself become a discrimination, as between shippers, and that such discrimination could be avoided only by a present waiver of such requirement, for a limited time. We think that the ruling thus promulgated by the Interstate Commerce Commission was within its power, and that it was authoritative as a finding that a waiver of such requirement did not, under existing conditions, tend to create discriminations; and that such waiver tended to uniformity and to the avoidance of discrimination. In the presence of this fact so found by this tribunal, we ought not to say that we will not recognize

a waiver, duly established as between the parties, as being forbidden by public policy. Our duty is further emphasized by the affirmative finding that the enforcement of the provision works a discrimination. In the presence of such fact, so found, public policy would forbid recognition of the bill of lading requirement itself. The waiver having been proved, we think, therefore, that public policy does not forbid our recognition of it. Finally, we may say that the proof of waiver is abundant as to each shipment, and that our conclusion herein renders the waiver available to the plaintiff as to each count of its petition. The condition of the bill of lading thus alleged to be waived was one in the nature of forfeiture. In such cases, the courts find a waiver more readily than when the substantial essence of a contract is involved. Cases on this subject are legion, from every appellate jurisdiction, and it would be idle to sustain the proposition with a citation of authority. In *Hudson & Co. v. Northern Pac. R. Co.*, 92 Iowa 231, 235, the rule was stated briefly as follows:

"Any agreement, declaration, or course of action on the part of him who is to be benefited by the contract which leads the other party to believe that, by conforming thereto, the forfeiture will not be incurred, will and ought to estop the promisee from insisting on the forfeiture."

And again:

" 'But it may be broadly asserted that if, in any negotiations or transactions with the assured, after knowledge of the forfeiture it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured, by virtue thereof, to do some act, or to incur some trouble or expense, the forfeiture is, as a matter of law, waived; and it is now settled in this court, after some difference of opinion, that such a waiver need not be based upon any new agreement or an estoppel,' "—the foregoing being quoted

from the opinion in *Titus v. Glens Falls Ins. Co.*, 81 N. Y. 410.

IV. The brief of appellant presents for our consideration questions pertaining to a garnishment proceeding. It appears that, as to the fourth shipment, the initial carrier was the St. Louis, Iron Mountain & Southern Railroad Company. After suit was brought, this company was, by amendment, made a party defendant, but no personal jurisdiction thereof was ever acquired. The plaintiff caused an attachment to issue against it, and served the attachment by garnishment. The garnishees so summoned were the other defendants in the case. They were garnished as supposed debtors of the nonresident defendant. They answered as garnishees. Later, in response to an order of the court, they answered again. The plaintiff filed a pleading controverting the answers. It also filed a motion to strike such answers, and a motion accompanied with a list of interrogatories calling for many details pertaining to the inter-line accounts of the defendant railway companies, with a view, undoubtedly, of uncovering, if possible, balances in favor of the attached defendant. Both the motion to strike and the motion requiring answers to these interrogatories were overruled by the trial court. Likewise, the petition to require the garnishees to produce books of accounts and papers was overruled. These rulings are all complained of in argument.

4. GARNISHMENT: time of perfecting appeal.

We do not think that the appellant is in any position to obtain, on this appeal, a review of such rulings. The garnishment was a part of the method of service of the attachment. The attachment proceeding is not a part of the main case, except in a collateral sense. The statute expressly provides that proceedings relative to the attachment are to be deemed independent of the main case, and only auxiliary thereto. Code Section 3877. If appellant's mo-

tions had been sustained, the issues arising on the answers of the garnishee and the controverting thereof would not be tried as a part of the issues in the main case. The answers of the garnishee did not show any indebtedness. On the face of the pleadings, therefore, jurisdiction was not acquired even *in rem*, as against the Iron Mountain road. Whether the garnishees were discharged at this time or not, does not appear from the record. If not, the final entry of judgment against the plaintiff would discharge the garnishment. *Harger v. Spofford*, 44 Iowa 369. It was open to the plaintiff to save the pendency of the proceeding by a prompt appeal within two days, as provided by Code Sections 3931 and 3932. A mere appeal from the judgment would not, ordinarily, be an appeal from the order discharging the garnishee. If it could be deemed such in this case, it would not avail the appellant at this point, because the appeal from the judgment was not taken within two days, as required by Section 3932. If the jurisdiction as to the Iron Mountain road were not dependent upon the attachment proceeding, the plaintiff's right of appeal in the main case as to such defendant would be the same as to any other defendant, regardless of the attachment. *Munn v. Shannon*, 86 Iowa 363. We must hold, therefore, that the rulings of the trial court pertaining to the garnishment proceedings are not before us for review on this appeal. It necessarily follows, also, that the jurisdiction *in rem* as to the St. Louis, Iron Mountain & Southern Railroad Company has been lost.

In this connection, we take notice, also, of a claim by the appellee that the Wabash Railroad Company has not appeared in this case, and is, therefore, not a party thereto. Some dispute of fact appears in the briefs 5. APPEAL AND ERROR: non-ruling in trial court. upon this question. It is not a question upon which any ruling was had in the trial court. No alleged error is, therefore, pre-

sented for our consideration. The dispute between counsel is whether defendants' counsel in the court below entered an appearance for the Wabash Railroad Company and for the Wabash Railway Company, or whether it entered such appearance for the Wabash Railroad Company alone. It is a question to be first determined in the court below. Our jurisdiction here can extend no further than that of the trial court, nor will it fall any shorter.

V. The point is urged by appellant that, in the event of a reversal, the case should be remanded, with directions to enter judgment, rather than for a new trial.

As to the first three shipments, being those which originated at Independence, Louisiana, both the initial and the terminal carrier are parties defendant. There was no intermediate connecting carrier. The plain-

6. APPEAL AND ERROR: directing judgment in lower court.

tiff has sued for the loss of the exact number of crates ascertained in the inspection reports made by the agent of the defendants. The bill of lading provided that, in the event of damage, the invoice prices paid at the point of shipment should be the basis of the measure of damages. The plaintiff has conformed to this measure of damages, and has claimed for the lost crates only at invoice prices therefor, plus the proportionate amount of freight paid thereon and the actual cost of sorting and separating the damaged berries from the salvage. The evidence is practically conclusive and without conflict as to the amount of this damage in each case. The resistance to the amount of damage made by the defendants at this point is argumentative only.

7. CARRIERS: damages: measure.

It is contended that the damage should be regarded as a damage to the entire carload shipment, and that the invoice prices should be considered for the entire carload shipment; and from such amount should be deducted the full amount realized from the salvage. If this method were

adopted, it is shown by appellees that the amount received by the appellant on the sale of the undamaged berries was equal to the amount of the invoice prices, and that, therefore, no damage resulted, within the meaning of, the bill of lading. This method would enable the appellees to absorb the profits of appellant's sales and apply the same to the discharge of the damage actually suffered.

There is nothing in the terms of the bill of lading that requires the adoption of this method of measuring the damage. Granting that it would be a proper method. if the plaintiff had sued for damage to the entire carload lot, he did not do so. It is argued for appellees that the evidence shows that the damages permeated the whole shipment. Even if that be true, the plaintiff had a right to waive it and to confine its claim for damages to such berries as were wholly destroyed. The rule required by the bill of lading, and adopted by the plaintiff, is more favorable to the defendant appellees than the ordinary rule of measure of damages which would obtain were it not for the requirement of the bill of lading. We reach the conclusion, therefore, that, upon a remand of the case, it should be with a direction to the trial court to enter judgment for the plaintiff on the first three counts of its petition: namely, those involving the shipments originating at Independence, Louisiana.

As to the fourth count of the petition, a somewhat different situation is presented. This is the shipment that originated at Judsonia, Arkansas. The defendant Illinois Central Railway Company is not interested therein. Only the terminal carrier is a party defendant before the court. The initial carrier, the St. Louis, Iron Mountain & Southern Railway Company, has not been successfully brought in, as yet. Under the Carmack Amendment, the initial carrier is liable to the shipper for

8. CARRIERS: initial and subsequent carriers: liability.

the full amount of the damage, regardless of its own negligence, and it may recover over from such connecting carriers as are in truth responsible for the negligence causing the injury. A somewhat different rule of liability obtains as between the shipper and the terminal carrier. The terminal carrier is liable only for its own negligence. The shipper, however, is entitled to the benefit of the presumption that such terminal carrier received the

**9. CARRIERS: damages: presumption.** goods in as good condition as they were in when received by the first carrier, and that the damaged condition, if any, in which

they were delivered to the consignee, was the result of the terminal carrier's negligence. On the other hand, the terminal carrier may show that the damage was not caused by its negligence, but by the negligence of a preceding carrier. The burden of proof is upon it, in such case. On the trial below, evidence to that effect was introduced on behalf of the terminal carrier. Whether it has overcome the presumption against it, is a jury question. We think that it must be said that a case of conflict of evidence is presented.

Nor is it to be overlooked that the damage

**10. CARRIERS: perishable goods: damages: burden of proof.** as to this shipment is predicated upon the decay of ripe berries; and that the burden is upon plaintiff to show their condition to have been such at the time of delivery for

shipment that they could not have decayed, except for negligent refrigeration. As to this count, therefore, the case will be remanded for a new trial. For the reasons indicated, therefore, the judgment below will be reversed and remanded on all counts. As to the first three counts, it will be remanded with directions to enter judgment for the plaintiff in harmony herewith. As to the fourth count, it will be remanded for a new trial.—*Reversed and remanded.*

PRESTON, C. J., LADD and STEVENS, JJ., concur.

SALINGER, J. I concur in all but Division 3. As to it, I think it is unnecessary for us to decide the point in this case.